Please be seated. I am making this announcement at each oral and in case some of you are here, it will be a repetition, so I apologize. Justice Zinoff is our third member of the panel. She has become ill within the last 24 hours and didn't feel that she could make the trip or sit here for the length of time. She will listen to all of these matters via the internet recording, so make sure that you are clear and concise in your arguments, please. And we will, of course, wait for her to conference with us before we make decisions in these cases. Your Honor, this is the second case of the morning called 212-438 James O. Toole v. Executive Travel, Inc. and Kathy Carter-Sears. On behalf of the Appellant, Mr. John Reardon, on behalf of Executive Travel, Mr. Robert Hottinger, and on behalf of Kathy Carter-Sears, Ms. Nancy Lishman. Alright, Mr. Reardon. May it please the Court, my name is John Reardon and I represent Plaintiff Appellant James Toole. My co-counsel, Peter DeBruni, is also present. I intend to focus my argument on issues relating to the trial court's rulings concerning the statute of limitations. And I will rely on the briefs for other issues unless there are questions. The trial court in this case incorrectly denied plaintiff's motion to strike and granted summary judgment before trial on the statute of limitations when the prior appellate court decision said summary judgment should not be granted and based on grounds as to which there was a genuine issue of fact. In addition, the trial court turned that summary judgment ruling into a ruling saying that he would not consider any evidence before June 23, 2001. After trial, the trial court incorrectly entered judgment for defendant based on facts that were contrary to those found by the appellate court in the previous appeal and were therefore law of the case and were obviously incorrect on the record and were contrary to the uncontested evidence. In the prior appeal, it was established by the appellate court that the employment agreement in this case was signed January 23, 1995. And that was on 1544 in the record. The travel contract was signed January 30, 1995, and the freight contract was signed February 20, 1995. The appellate court concluded that there was a genuine issue of material fact and reversed the grant of summary judgment at that time, saying that the Sun Strand contract referred to in the employment agreement could be either the travel agreement or the freight agreement or both. But it didn't say it had to be both. It did not say it had to be both. And so on remand, what was the position? I mean, what was the trial court to do? Well, as far as summary judgment was concerned, our position is the trial court shouldn't have granted summary judgment. This was a... But, I mean, in reality, wasn't it sent back for determination of which of those two contracts, the travel or the freight, was part of the employment agreement? That was part of why it was reversed, yes, Your Honor. All right, but when it went back, the trial court was supposed to make that determination, correct? The trial court was supposed to make a determination about whether the employment agreement was referring to one or the other or both of the agreements. And the trial court here did make that determination and said it was the travel agreement, correct? Yes, it did. And when it did that, it did that based on a fact that was clearly a different fact than the one that the appellate court had found, and that was obviously incorrect on the record. The trial court said that the travel agreement was signed January 23, 1995, the same date as the employment agreement, whereas the appellate court had found that the travel contract was signed January 30, 1995, later. And so the trial court was basing its decision on a fact that was not only obviously incorrect on the record, but contrary to the law of the case that was established by the appellate court. What is your understanding of law of the case? Any facts found by the appellate court and law found by the appellate court are law of the case on remand unless they're palpably erroneous or unless there is some higher court that comes to a different determination in the meantime. Well, I've never seen seven days be called palpably erroneous, but it could be virtually erroneous if there were new facts introduced at the trial court level, correct? Well, the standard would be that the trial court would only reverse, I mean, the appellate court would only reverse its prior decision about the law of the case if its decision was palpably erroneous. And that was not the case. As a matter of fact, the facts supported the fact, the facts at trial supported that the travel agreement was signed January 23, I'm sorry, the employment agreement was signed January 23, 1995, and the employment agreement was signed January 30, 1995. So actually what was palpably erroneous was the trial court's decision. And this was important, Your Honor, because the trial court was relying on that fact to determine the intent of the parties as to the meaning of the provision in the employment agreement. The trial court was saying because these two agreements were signed the same day, therefore, they must have meant that they must have been referring to the travel agreement, not the freight agreement, which was signed later. Well, actually, both of them were signed later. So the trial court was incorrect and incorrect in a critical area because it misled the trial court as to the intent of the parties about what was referred to as to that termination provision. But wasn't there testimony as well that although Mr. Toole did handle the freight and other issues at Sunstrand when he was there, that his, I mean, the discussion that he had with executive travel primarily dealt with travel issues, not freight, not the other issues, freight, what is it, well, it didn't deal with freight. Well, he definitely did deal with freight during the entire time that he was employed there. As a matter of fact, that freight agreement, the issue that the appellate court asked, send it back to deal with, the testimony in trial was clear that the freight agreement continued until April 30th, 2006. But, I mean, the question that when I looked at that previous decision is what agreement was contemplated? What employment was contemplated at the time that Mr. Toole became an employee of our defendants here? Was it just the travel that Sunstrand employees would do or was it more comprehensive? And I think basically what the trial court found or what can be read into what the trial court found is it was just the travel. So how is that erroneous? That's erroneous because the reason for his finding that was because he said that the date was the same, the same date of signing. There wasn't any other evidence taken? The only evidence was just about the dates everything was signed? No, there was other evidence, Your Honor. There was evidence that Mr. Toole did work on the freight agreement. There was evidence that he did work on the travel agreement. In fact, Mr. Toole had to negotiate that freight agreement after he was an employee of the appellees, correct? It didn't exist at the time. I think the evidence will show, Your Honor, if you look at it carefully, that it was actually the defendants that negotiated the freight agreement. And it was not in effect at the time and neither was the travel agreement. Neither were in effect at the time that the employment agreement was signed. Neither of them were in effect at the time that the employment agreement was signed. Okay, so the bottom line here is the trial judge hears a myriad of evidence and you're hanging your hat on the fact that the trial court got the dates wrong and that therefore its ruling on the summary judgment inherently has to be wrong because it's so heavily, in your opinion, relied on the two contracts being signed the same day rather than 123 and 130. Is that the gist of it? That's part of it, Your Honor. The other thing that's linked with that is that the trial court, after it ruled on summary judgment, says, I'm not going to hear any evidence. First it said, I'm not going to hear any evidence that occurred before June 23, 2001, which was the determination date that the trial court came to as to when the statute of limitations, that was the date you had to meet. And so he announced that at the beginning of the trial and then continued the trial, took evidence. Then at the end, after he had indicated to everybody that that was going to be his approach, then he did obviously consider evidence that occurred before June 23, 2001. This is obviously incorrect. It's a ruling on the competency of evidence that was perfectly competent and relevant before trial, misleading counsel on both sides about what he would consider. Isn't that kind of no harm, no foul? I mean, the court said, look, I'm not going to consider it and then let you bring it in anyway. Well, I mean, essentially he's making a ruling on what is the evidence before he ever hears the evidence and says it's not, I'm not going to hear it. I get that. But inherently, it's almost like his own motion to reconsider his or her. I forget how the trial judge was, but inherently he said same to himself. OK, I am going to let this in just because I didn't say it on the record. What's the. We had to then go to trial with that ruling and have it, you know, the judge has indicated that he doesn't think that he's going to hear any evidence. So we have that ruling against us at the beginning. And what were you precluded from bringing in? What would you have brought in had that ruling not been made? We did bring in. We tried to bring in all the evidence that we thought was relevant, even in light of that ruling. But we it was an incorrect ruling and prejudices the prosecution of the trial. There you go. There's a conclusion. Again, my question is, how were you prejudiced? What evidence was precluded from coming in? Your Honor, I can't point to any particular item. You say it was prejudice. Show me how it was prejudiced. I can't point to any particular item of evidence that I would have brought in otherwise. OK. And your honors. So that was an incorrect ruling on the the dates. And then the. The effect was to. The other important issue, your honors, is that the trial court's ruling is. An implicit rejection and not considering the issues that we had raised regarding the statute of limitations concerning by by announcing that the cutoff date is June 23, 2001 before trial. I'm not he did not rule on any of our. Arguments concerning that there was a new promise to pay the debt on the bonus that there was testimony that Mr. And, you know, just wait and plaintiff did continue to wait. He relied on that promise. He relied also on a statement from the secretary treasurer of the company that said. Here's a check. It's not a profit sharing, but Bruce will take care of you on your profit sharing. And he continued to wait. He continued to be employed. He continued to get paid. And all of those things together show a new promise to pay. And his salary ever change his salary after 2000, June 23rd, 2001. No, it's his salary. It stayed the same. So there were no raises. Cost of living. Those things are cost of living was supposed to be paid to him as provided in the but he never got cost of never got paid. Cost of living increases that was included in the employment agreement. And there were no other. There were no other discussions that would might be considered, at least in your client's mind, outside of the employment agreement. They were all within the employment agreement. I'm not sure exactly what your honor is getting at. Well, if there were conversations about I'd like a raise or this or that, your client considered those all to be under the employment agreement. To the best of my knowledge, there wasn't any testimony about him asking for raises. There was testimony that towards the end of his employment that he had, he asked to be paid his bonus and he said, I want my money. This would be in 2005. And he talked to the president about that. And then there was a meeting with Mr. Hatchness in 2006 where he said, I want my money. And Mr. Hatchness says, I'm not paying you a dime. That's a long time ago. But he didn't ask for raises per se. So the new promise to pay was shown and a stopper also was shown and should have been considered by the trial court and the trial court by grand summary judgment and excluding evidence before January, I'm sorry, June 23rd, 2001. Excluded those arguments and did not consider them. And there was clear and good evidence of the, of those factors that would extend the statute of limitations. Defendants have argued that the continuing to work does not extend the statute of limitations. They cited the REIT case, but that was an entirely different case. In that case, the employee had been terminated well before the statute of limitations and had time to file his action. In this case, the employee, Mr. Tool, continued to work until approximately April 30th, 2006. And he continued to be paid his base salary, correct? He continued to be paid his base salary. What he believed to be his base salary. I guess that's where the difference lies. It would be his base salary, his $102,000. You'll have an opportunity for a rebuttal. Thank you, Your Honor. Thank you. I'm assuming that counsel are separating their time. And who will be first? Ms. Fischer got it first, so I assume it's her. I will be first, Your Honor. My argument really will be presented on behalf of all the employees. I do, by the way, represent all the employees except executive travel. And Mr. Pottinger, who is here, will be available to answer any questions, perhaps correct any misstatements by me. The plaintiff has now agreed that in the first appeal, this court ordered that the sum-strand contract, that the reference of the employment contract to a, quote, sum-strand contract is ambiguous and that it could apply to either the travel or the freight or perhaps both. This court in the first appeal only decided that there was a material issue of fact. It did not enter any facts. There were no fact findings by this court because the only thing that was before it was, is there a genuine issue of material fact that precludes summary judgment? How did the January 30th, 1995 date come to light then? I don't know how this court said January 30th. I think what happened was the bid for the travel contract had already been accepted in December of 1994. When the employment contract was signed, there was no freight agreement, but we knew the bid was accepted. And I believe that the date that the plaintiff started work, which was January 30th, is when the contract, the travel agreement was signed with sum-strand. But the bid was already accepted. And of course, the plaintiff admitted he was not part of the bidding process, so he did not and could not know if the freight agreement was part of that bidding process. The evidence is clear that Bruce said, I had no idea that there would be a freight agreement, that the bidding process did not encompass a freight agreement. And in fact, we know this because the plaintiff admitted he drafted the initial employment agreement. He didn't talk about the freight agreement. He only talked about the sum-strand agreement. And when he said to Bruce, according to the testimony at trial, well, I might do a side deal. Now that's something Bruce said, testified, the plaintiff said to him. The plaintiff denied it, but it was up to the trial court to make those findings a fact, resolve any inconsistency in the evidence, and find credibility of the witnesses. How, I mean, how fair is it really to say that the plaintiff or the appellant had no, didn't participate in this agreement or in the bidding, when in fact he had talked about this with Bruce a long time before this ever happened, two to three years. There was an issue about it. But they only talked about the lucrative trial business, trial. Travel. Travel, thank you. Too much of a lawyer. The lucrative travel business, and that's a finding a fact by the trial court. When this court remanded and said, court, on remand you have to decide if it was the travel or the freight or both, that's exactly what the trial court did. It held a bench trial and it made that determination. I would like to just reiterate what Justice Jorgensen said, which is it's not really fair to say that this judge said, I'm not going to consider evidence before June 23. He said, you filed suit on June 23, 2006, and then he said, okay, you simply take five years back from that date, and that's all he did. He did say, I'm not going to stop the plaintiff from presenting any evidence as to claims. And then the next sentence he says, oh, I won't be considering that evidence for purposes of this ruling. So essentially in context what he says, present all the evidence you want, but I think claims pre-June 23, 2001 are barred. He did not hold that he would limit evidence at trial. I believe Justice Jorgensen asked, what's the prejudice? What evidence was not brought? I can't find it in my brief, but I do say twice in that brief, they pointed out one question where there was an objection, but the plaintiff ignores that that objection was overruled and the witness was permitted to testify. There was another objection about a time frame that encompassed both the first travel agreement and the second. The objection to this overly broad question was sustained, but of course to preserve the issue for review, he should have made an offer of proof or asked him and limited the time frame. We do know that this trial court considered all the evidence because he discusses it when he makes his findings. But it becomes not relevant if the cutoff date is five years is essentially what he said. Well, he didn't say evidence was not relevant. He said claims. And I think when you're talking about claims that accrued or arose more than five years before suit was filed, that's really doing the math, Your Honor. It's just doing the math. There were findings by the trial court very specifically that the plaintiff's version of offense was not credible. The bid was accepted in December. Plaintiff didn't know about the bidding process. So his statement that, well, my employment contract referred to both of these agreements lacks credibility, not only because he wasn't part of the bidding but also because he initially drafted the employment agreement without any reference to the freight agreement. He only referred to one. And Bruce said the additional reference to the freight agreement was only added later because in the event that the plaintiff entered into a freight agreement. You know, it's true, the plaintiff's version of events differs from other evidence in the record. But that's exactly the role of a trial court, to weigh the evidence, determine credibility of the witnesses. And the judge said it makes no sense that if you think you're owed hundreds of thousands of dollars that you would continue working for this company. That's a fact that the court found. In addition, just on its face, his argument is he agreed to put off profits of over $200,000, which was a big deal to him. When every other time, according to him, our clients denied his version of events, but he said, you know, every time I was asked, I was owed a profit, I was asked to forego it, and I insisted and I was paid. So then when it came to $200,000, according to him, suddenly he agrees to forego, which is incredible. At that point, there was no reason to think that Sunstrand would cancel or terminate the contract. He was still the point man. And there was no reason for him to agree to forego any profit. You know, the fact that the trial court didn't agree with his version of events does not mean. There were facts that maybe would have, that involved not what was happening at ETI and with Mr. Toole, but in the they're paid a much less amount of money per travel arrangement and things of that nature. So there were some exterior factors over which nobody really had any control, correct? Well, that's true. And our position is, is that there was never a profit in the years in question, 1999 and 2000. We just didn't make a profit. It's incredible. The plaintiff said, well, I did a calculation. And he said he prepared a budget of $700,000 and that's all that Sunstrand or UTI had to pay. He admits under cross-examination, I believe, but he does testify. Well, our expenses were $902,000. He still thinks he had a right to gauge profit, even though, based on the $700,000, even though the $900,000 was never, was the actual cost to the company. They did not profit. There was a loss, a $200,000 loss. Your Honor, the bottom line in this case is that the first summary judgment by this court said, remand, you have to hold a trial. You have to make an adjudication of the fact of what is the reference in the employment agreement. Is it to the freight or the travel agreements or both? That's exactly what this trial court did. After weighing the evidence and holding that the plaintiff's version of events was incredible, it held that the travel agreement was referred to. The travel agreement terminated on August 5, 2000. The trial court added 90 days to bring it to November of 2000, and the plaintiff still did not sue within five years. Your Honor, as for the other miscellaneous points, unless you have questions, I'll rely on my brief. Thank you. Thank you. And now, Mr. Pottinger, if you have any questions. Good morning. Good morning, sir. Very briefly, I just want to put a little bit of context here. As Ms. Lesher pointed out, Mr. Toole was the one who drafted this employment agreement. But all it said was the SunStrand agreement. It's referred to just the SunStrand contract. The agreement also did contemplate the freight agreement. It said if Jim enters into a freight agreement directly with SunStrand, then his compensation would be reduced by the amount of his compensation. So clearly, the court, I'm just reiterating what the trial court found, the SunStrand contract in the singular only referred to this very big contract. In effect, because his salary is $102,000 and the freight agreement $73,000, as it turned out, the freight agreement is totally revenue neutral to ETI. It's just they didn't know how that agreement would ultimately be structured down the road. Would SunStrand want to pay Mr. Toole directly, or would it allow the freight agreement to be compensation to be paid to executive? Because the executive, as was testified by Mr. Hanks, was not in the freight business. It was simply in the travel business. It had no background in it, didn't need the business, didn't want the business. All right. And if the freight business contract was entered into in any form, would it not, or did this employment agreement provide for these bonuses based upon that agreement? Because we've got different provisions. I mean, is this employment agreement divisible, or is it one agreement such that if bonuses were allowed for SunStrand work, would freight be part of the SunStrand work? I'm sorry. I don't understand. Well, what I'm saying is there's an employment agreement. I will work for X amount of dollars. It's based on the SunStrand contract. I would get profits. I will get, you know, profits by percentage. If there's another contract, it will be paid this way. Is there anything about profits from that one? No, it wouldn't be totally revenue neutral because it reduces his base salary. All right. So it would – I know the – Go ahead. Real briefly, I just want to point out a couple other things. He was the head of the division, this travel business division. The testimony was he worked just steps down from both Minou Hegshanis and Kathy Carter-Sears, the treasurer and president of the company. He testified he was never denied financial information that he ever requested. As the court pointed out, the contract was a SunStrand contract. When that ended, we took a position that ended earlier. The court found that it ended in August of 2001, and effectively, it's over. The multiple employees that were under Mr. Toole's control or direction ended, and it became essentially, I think the court's term was a division of one. Remind the court that the complaint is simply based on the agreement. It's not based on some other oral statement. The complaint that was filed in this case is based on a breach of the agreement. And I would just reiterate that all the evidence was accepted. Their allegation that the court did not consider evidence before June 23, 2001 is directly contradicted by the record. Because, for instance, financial records for the first three years were put into evidence. The court considered all the evidence, and right after its ruling said, I'm going to allow all the evidence in. So all the evidence was clearly allowed to be presented, subject to whatever evidentiary considerations the court would have in any other trial. So there is no prejudice whatsoever with regard to the court's ruling. And they've not really articulated the positions to why a claim arising prior to the five years would be allowed. Thank you, Your Honors. Thanks for your additional time. Thank you. Mr. Rudin. First, Your Honor, of all Your Honors, it's clear that the testimony, if you look at it, is that the original intention, this was Jim Toole's idea. Let's outsource what I do at Sunstrand to executive travel. But he didn't remain a Sunstrand employee. No, he didn't. That was the idea. That's what outsourcing is all about. It's like, instead of just outsourcing the business, outsource me. But I'm going to be paid by ETI. That's correct. Okay. And he said, I do freight, I do travel, and both of those were outsourced to ETI. That was what he decided to do. He saw the writing on the wall as far as the trend in outsourcing. And was he directly involved in the negotiations? No. But he knew about the process, and the testimony will show, he had communications with people at Sunstrand. He knew what was being considered. He knew that freight was being considered. He knew that travel was being considered. And the evidence will show that he was involved with it, even though he wasn't sitting in the room when these documents were done. But if he drafts the document, the employment agreement, and ETI or their principals could look at it and probably make a correction or two, or maybe not. But if he drafts it and it says Sunstrand contract, and we have two Sunstrand contracts ultimately, why shouldn't that be held against him? The agreement, you're asking why shouldn't it be construed against the drafters, essentially. Correct. And this isn't a drafter from a big corporation. This is a person who was organizing this whole thing. He drafted it himself because, according to his testimony, he and Bruce couldn't necessarily agree on what that salary was, so he made sure he put in the $102,000. First of all, Your Honor, this is not a contract case. This is a wage act case. And you don't need the same level of specificity in agreements in a wage act claim as you do in a contract claim. And I haven't ever seen the principle of contra pro forensum being used in a wage act case, and I doubt that it would apply. Second, the practice was clear that both of those were included in the employment arrangement that Mr. Toole had with ETI. He did both of those. The revenue that they received from him in terms of his freight, the freight revenue, the $73,000 a year, that was included in their revenues on which they calculated profitability, and his salary was included in their expenses. So that was all part of the deal together, Your Honor. But if the deal is determined to be otherwise because the language is if, how is that then all part of the deal? Because didn't the employment agreement say if the freight agreement or if the freight comes? It was an if. It was a day of when. But the if was if instead of actually having a deal, and I'm adding words, but basically what it said is if Sunstrand pays Jim directly instead of through ETI, then that $73,000 gets subtracted. Okay, but that wasn't what they did. That was an if that never came up. Sunstrand and ETI did reach an agreement on freight. It was signed February 20, 1995, as the appellate court did find. We believe those are definitely findings of fact, clearly findings of fact. And so that if is really not effective. What it does show is that the parties were thinking not only, as Mr. Pottinger conceded, that the parties were thinking when they did the employment agreement not only about the travel agreement, but also about the freight agreement. And I don't think I have anything additional to add unless your honors have questions. All right, thank you. Thank you.  We will take the matter under advisement, give Justice Enoff an opportunity to hear the arguments, and we will render a decision in due course. Thank you.